UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BARBARA J. CASTILE,              )
                                 )
              Plaintiff,         )
                                 )
       v.                        )   CASE NO. 1:09-cv-0023-DFH-TAB
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of the              )
Social Security Administration,  )
                                 )
              Defendant.         )

ENTRY ON JUDICIAL REVIEW

Plaintiff Barbara Castile seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her application for disability insurance benefits and disabled widow's benefits under the Social Security Act. Acting for the Commissioner, an Administrative Law Judge (ALJ) determined that Ms. Castile was not disabled under the Social Security Act because her impairments did not meet or equal a listed impairment and she could perform work that she had performed in the past. For the reasons discussed below, the court affirms the Commissioner's decision.

*Background*

Plaintiff Barbara Castile was born in 1952. She graduated from high school, married, and had two children. She lived with her husband until he died in October 2001, after which she lived alone in a house owned by her father. She

worked from 1990 until 1991 as a salesperson, from 1994 to 1996 as an order entry clerk, and from 1998 to 2001 as a teller for several different banks.  Ms. Castile applied for disability insurance benefits and disabled widow's benefits on March 20, 2002.  She sought disability benefits because of fibromyalgia, arthritis, chronic fatigue, depression, obesity, high blood pressure, and sleep apnea, among other impairments.  Ms. Castile's application was denied initially on June 21, 2002, and on reconsideration on November 13, 2002.   After a hearing, Administrative Law Judge Peter Americanos again denied Ms. Castile's application on June 9, 2003.  The Appeals Council remanded the case for a supplemental hearing on April 22, 2005.  After the supplemental hearing, ALJ Americanos again denied Ms. Castile's application on February 12, 2007.  R. 10.   The Appeals Council denied further review.

I.      *Medical Record*

        The record of Ms. Castile's medical impairments begins in early 1995, when her primary caregiver referred her to Dr. Todd Dudley for "progressive fatigue." Ms. Castile also complained of depression, sleeplessness, obesity, and headaches. R. 726.

        Dr. Dudley's initial impression was that "most if not all of her problems are related to" her depression.  R. 727.  For the first of many times, Dr. Dudley recommended "changes in her life-style, exercise, weight loss, change in her

dietary habits, etc." *Id.* From 1995 to 1998, Dr. Dudley continued seeing Ms. Castile several times each year. He prescribed a variety of antidepressants, including Paxil, Wellbutrin, Serzone, and Prozac, with limited success. R. 471, 739-40, 750. Ms. Castile's weight fluctuated between 187 and 215 pounds, all considered obese for a woman five feet, two inches tall. R. 732, 736. In June 1998, Dr. Dudley summed up his frustration in treating Ms. Castile: "She still feels tired and depressed. She cannot get out of bed in the morning, though she does not sleep well. We adjusted her medicines, it did not help." R. 747. During the same period, Dr. Dudley repeatedly expressed his opinion that depression and deconditioning were at the heart of her medical problems. R. 465, 471, 739.

In July 1997, Ms. Castile was referred to Dr. William Driehorst, an orthopedist, for pain in her back. R. 603. Dr. Driehorst diagnosed lumbar degenerative disc disease and recommended a "[t]herapy and exercise program for lumbar stabilization, overall conditioning and work toward weight normalization." R. 510-11. There is no evidence in the record that Ms. Castile saw a therapist or began an exercise program.

In July 1998, Ms. Castile was referred to Dr. Manfred Mueller for "chronic fatigue and somnolence" and shortness of breath. Like Dr. Dudley, Dr. Mueller suggested that Ms. Castile's fatigue arose in part from her depression. R. 508. Dr. Mueller arranged for sleep testing, including nocturnal polysomnograms performed on August 27-28 and October 19-20, 1998. R. 625, 644. Based on

these tests, Dr. Mueller diagnosed Ms. Castile with obstructive sleep apnea.  R. 625.  He recommended that she use a continuous positive airway pressure (CPAP) machine, which largely resolved Ms. Castile's "snoring and respiratory disturbances."  *Id.*  On November 25, 1998, Dr. Mueller reported that "[o]verall her sensation of unrefreshing sleep has improved."  He recommended that Ms. Castile continue to use the CPAP machine and that she reduce her weight to 150-160 pounds.  R. 658.

In November 1998, Ms. Castile fell at work, resulting in pain in her neck and legs.  Physical therapy in December 1998 helped to resolve these injuries.  R. 368.  On December 15, she was discharged from physical therapy and released to work without restriction.  R. 456.

Ms. Castile next saw a physician in March 1999, when nurse practitioner Rebecca Russell treated her for flu symptoms.  At the same appointment, Ms. Castile mentioned that she had stopped taking her prescribed antidepressants because she had changed jobs and lost her insurance.  According to Nurse Russell, Ms. Castile was in tears and said:  "I just really need to have my Paxil." R. 751.  By July 21, 1999, when Ms. Castile again met with Dr. Dudley, she was taking Paxil again but her condition had otherwise worsened.  Her blood pressure had risen to 170/100, she was having difficulty sleeping, and her weight had risen to 235 pounds.  R. 752.  Dr. Dudley remarked that Ms. Castile did not consistently use the CPAP machine prescribed for her sleep apnea.  Ms. Castile

also told Dr. Dudley that she had read extensively about fibromyalgia and thought she had the condition.  *Id.*

Ms. Castile had improved somewhat by September 8, 1999, but she still had trouble sleeping.  In addition, Dr. Dudley noted that Ms. Castile's rheumatologic exam was consistent with "classic fibromyalgia."  R. 455.  Although her weight was down, Dr. Dudley continued to counsel diet, exercise, and weight loss.  *Id.* Over the next six months, however, Ms. Castile continued to gain weight, became more depressed, felt more tired, and had a general worsening of her conditions. R. 452, 453.  On May 1, 2000, Dr. Dudley wrote:  "I had to spend about 30 minutes with her today discussing her situation with her husband.  It is really just quite an awful mess, and I think this really is where the basis of how she feels really comes from."  R. 452.  When Ms. Castile visited him with similar complaints on June 30, 2000, Dr. Dudley wrote:  "She is very noncompliant.  She is very depressed.  . . .  She and her husband I think are feeding off of each other, they are very codependent and histrionic.  . . .  They both seem to have accepted the sick role with open arms.  They like the attention, they like medicines."  R. 451.

On the same day, Ms. Castile saw Dr. William Berg, a cardiologist at the St. Francis Heart Center, for pain in her chest.  Dr. Berg conducted a cardiac imaging scan ("Myoview scan") of Ms. Castile's heart and concluded that the scan's results were "reasonably positive for ischemia," a form of heart disease.  R. 338.  Five days later, on July 7, 2000, St. Francis conducted a cardiac catheterization to

confirm the ischemia.  Dr. Berg concluded from this second test that the first scan had been a false positive.  R. 593-94.

Also in July 2000, Ms. Castile saw orthopedist Dr. Driehorst again.  She complained of low back pain and said she had "been off work recently in her job as a bank teller because she thinks bending her neck attributes [sic] to her problems."  R. 561.  Dr. Driehorst found "[f]ull painless motion in all planes" on her lower back, but suggested that she "may have myofascial/fibromyalgia type pain" and recommended MRIs for her lumbar and cervical vertebrae.  He went on to write:  "If they are not very remarkable I will strongly suggest physical therapy and exercise program."  R. 562.  Doctors at St. Francis Hospital Center conducted the MRIs and found generally mild or moderate spinal defects, including mild spinal stenosis due to diffuse disc bulges at C3-4 and C4-5, mild to moderate spinal stenosis and bilateral foraminal narrowing at C5-6, diffuse disc bulge and mild bilateral foraminal narrowing at L5-S1, and mild bilateral recess stenosis at L2-3.  R. 314-16.  Dr. Driehorst concluded from these results that there had been "no significant change in her lumbar MRI since 1996," and "nothing ... exceptionally significant" in her cervical MRI.  R. 563.  He maintained a diagnosis of "Cervical and lumbar degenerative disk disease" and "Probable fibromyalgia," recommending "therapy and exercise" for treatment.  *Id.*

In 2001, Ms. Castile saw Dr. Dudley a number of times, again complaining of back pain, fatigue, and depression.  Dr. Dudley continued to believe that her

depression and her obesity were at the root of her symptoms.  In January 2001 he wrote:  "Bottom line is she is depressed and manifests a lot of somatization."  R. 450.  In March 2001 he wrote:  "Her depression continues to muddy the water on all of her physical complaints."  R. 449.  At the same time, Dr. Dudley reported that the antidepressant Paxil, which had been effective for Ms. Castile in the past, was "not working," and "she wants to switch to Prozac."  *Id.*  Nurse Russell reported twelve days later that Ms. Castile "has been on Paxil previously, but has not taken that for the past 3 weeks."  R. 754.

There is a break in the medical record until November 18, 2002, during which time Ms. Castile appears to have changed treating physicians.  She saw Dr. Bruce Bender on that date, following up on complaints of pain, fatigue, and depression.  R. 788.  Dr. Bender noted that Ms. Castile's fibromyalgia was "stable" and recommended that she continue use of the CPAP machine for her sleep apnea.  *Id.*  Two months later, in January 2003, Dr. Bender wrote that the death of Ms. Castile's husband in October 2001 had "complicated" her depression, and he suggested psychiatric help.  R. 787.  He added that he would ask Ms. Castile's daughter to "ensure she makes it to her psychiatric consult," since Ms. Castile "makes excuses for each and every appointment and referral I have given her including the cardiologist and psychiatrist."  *Id.*

Ms. Castile did see a psychiatrist soon after, visiting Dr. Teresita Briones-Ramilo on February 27, 2003.  R. 691.  Dr. Briones-Ramilo diagnosed major

depression, as well as fibromyalgia, sleep apnea, chronic fatigue, and hypertension.  R. 692.  Dr. Briones-Ramilo wrote that Ms. Castile "has received no previous treatment for her Depression by a mental health professional" and that she was "tearful throughout the evaluation," with "very poor" concentration. *Id.*  Dr. Briones-Ramilo prescribed individual therapy to "help her deal with her stressors and to help her with her self-esteem."  R. 693.  Because "she has been tried on almost all medications on the market" without success, Dr. Briones-Ramilo prescribed Strattera, an ADHD drug, in the hope that helping Ms. Castile with her concentration would also alleviate her depression.  *Id.*

In April 2003, Ms. Castile saw Dr. Larry Greenbaum, a colleague of Dr. Bender.  Dr. Greenbaum noted Ms. Castile's psychiatric treatment, concurring that her depression was "aggravated by the death of her husband," who "was an alcoholic."  R. 786.  For her fibromyalgia and sleep apnea, he recommended continuing use of pain medication and the CPAP machine.  *Id.*

Ms. Castile returned to see Dr. Driehorst, the orthopedist, in July 2003.  R. 297.  Dr. Driehorst noted that she was "diffusely tender in both fibromyalgia and non-fibromyalgia points."  R. 298.  The pain and depression medication she took had only a limited effect.  Dr. Driehorst reported that Ms. Castile "says she hurts so bad she doesn't get out of bed on three or four days of the week."  *Id.*  He reiterated an earlier diagnosis of "Probable fibromyalgia" and recommended that Ms. Castile ask for a "longer acting pain medication."  R. 299.  Finally, Dr. Driehorst commented that "a number of her subjective complaints of pain have

a functional influence" and that, "[f]rom a purely physical standpoint, there is nothing in terms of her low back disease that should preclude her from working as a bank teller." *Id.*

The most recent physician's report in Ms. Castile's medical record is her visit to Dr. Samuels, another colleague of Dr. Bender and Dr. Greenbaum.  Ms. Castile reported continued fatigue, depression and pain.  Dr. Samuels wrote that "weight loss would help immensely in some of these areas," but that Ms. Castile "has not started her exercise program as previously recommended."  R. 781.

In late 2005, Ms. Castile took part in an intensive outpatient program (IOP) and partial hospitalization program (PHP) through the Community Health Network.  R. 828.  There are several pages of "progress notes" from this program, some of which detail improvement in Ms. Castile's condition.  R. 800, 801.  On other days, however, Ms. Castile reported that she could not participate because of her ailments.   R. 794, 796, 797.   The record contains no more recent documentation of her participation or progress in these programs.

II.    *Testimony at the Hearings*

ALJ Peter Americanos held two separate hearings on Ms. Castile's claims. The first hearing was held on May 16, 2003, and, following a remand from the Appeals Council, the second hearing was held on March 3, 2006.  R. 838, 886.

At the first hearing, Ms. Castile testified that she had fibromyalgia, "which causes a lot of muscle discomfort," as well as contributing to her depression and fatigue.  R. 845.  She later testified that "[a]ll my muscles hurt all the time," in "the entire body," and that the pain never went away.  R. 857.  In addition, Ms. Castile testified that she had "degenerative arthritis in my neck and my lower back," which meant that "to sit for any length of time my back hurts constantly." R. 846-47.  She testified further that "[s]tanding is excruciating in my lower back for any length of time," and when she bent her neck "the pain radiates from my neck into my shoulders."  R. 848.  Ms. Castile testified that she had "very severe" depression and that she had "a hard time getting up and getting going in the morning and just facing everyday challenges."  R. 848-49.  She testified that she had sleep apnea, for which she wore a mask, but that she slept only "four or five hours a night" and had trouble sleeping.  R. 855.  Finally, she testified that she had medication-controlled hypertension and carpal tunnel syndrome.  R. 854-56.

Ms. Castile also testified about her physical abilities and daily activities. She testified she could sit no more than 30 minutes and stand no more than 15-20 minutes without pain.  She could walk only 100 feet and lift no more than 5 pounds without pain.  R. 858.  Ms. Castile testified that she rarely drove.  She testified that she read novels, did household chores, and occasionally went to church and restaurants, but that she often stayed in bed for most of the day.  R. 859-63.  Ms. Castile testified that she had not worked since March 2001 and that

she had been fired from several jobs before that date for excessive absences due to her impairments.  R. 843, 864-68.

Medical expert Dr. Emily Giesel testified that Ms. Castile did not meet any disability listings and that her residual functional capacity was limited to the full range of sedentary work.  Dr. Giesel was unable to testify fully about Ms. Castile's ability to work because many original medical records were missing from the record.  R. 871-74.  Vocational expert Gail Ditmore also testified at the hearing. Ms. Ditmore testified that a person of Ms. Castile's age, education, and experience who could do light work but had to miss one day per month could perform Ms. Castile's previous work as a bank teller or order clerk.  R. 878-79.  Ms. Ditmore also testified that, if the additional restriction of a no more than superficial interaction with others was added, Ms. Castile could not perform her prior work but could perform a number of sedentary, unskilled jobs in Indiana.  R. 880-81.

The Social Security Appeals Council remanded the case for a second hearing to evaluate further Ms. Castile's residual functional capacity, her mental impairments, and her ability to return to her past work.  R. 228-29.  At the second hearing, Ms. Castile acknowledged that her doctors had recommended that she lose weight, but she testified that "after a day or two of trying to exercise I just slip back into my old habits."  R. 889-90.  She testified that she had chronic fatigue, which she thought to mean that "I don't get the proper rest that I need."  R. 892-93.  Ms. Castile testified that her fatigue made her unable to stand "for any length

of time."  R. 893.  When the ALJ asked if she could sit and work, Ms. Castile testified that she could not "sit for a long time either because of my lower back with the arthritis."  *Id.*  She later testified that she could sit "[a]t the most 30 minutes to an hour but I have to get up.  I have to move."  R. 908.

Ms. Castile testified that she had suffered from chronic fatigue since 1995 and that she had forced herself to work but missed "a lot of work on each job." R. 895.  She also testified that she had severe migraines and irritable bowel syndrome, which gave her diarrhea four to five times a day.  R. 896-98.  She had trouble with memory and concentration, sometimes getting lost.  R. 900-01.  She also continued to suffer "muscle aches" and pain from fibromyalgia, as well as "panic attacks" from her high blood pressure, though that condition was controlled with medication.  R. 901-03.  Finally, Ms. Castile testified that she had seen a therapist for her mental distress but that she did not attend therapy regularly because she "didn't feel good" or "had the flu."  R. 905.

Ms. Castile again testified about her physical activity.  She testified that she could not stand for an hour and could walk a block at the most.  R. 908-09.  She drove short distances occasionally, read, and did some household chores.  R. 909-14.  Ms. Castile testified that she had spent much of the day before watching TV or in bed.  R. 915-16.

Dr. Georgiann Pitcher, a psychologist, testified as a medical expert.  From the medical record that she had reviewed, Dr. Pitcher testified that Ms. Castile had had "depressive symptoms for a long time" but that no limitations on her ability to work were documented in the record.  R. 923-24.  From the hearing transcript, it appears that some medical records were omitted from Dr. Pitcher's review.   R. 924.  Those records were likewise not included in the medical record submitted to this court.

Vocational expert Ray Burger testified that someone of Ms. Castile's age, education, and experience who had to take one day off per month could perform her past work as an order clerk.  R. 925.  He further testified that if such a person had to take two days off per month, then no work would be available, and that a need for more than two unscheduled 15-minute breaks per day would make finding work difficult.  R. 927-28.

*Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance and disabled widow's benefits that she seeks, Ms. Castile must establish that she suffered from a disability within the meaning of the Social Security Act.[1]   To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful

---

[1]The ALJ determined that Ms. Castile met the non-disability requirements for disabled widow's benefits.  R. 14.  Disability under 42 U.S.C. § 423(d) is therefore the decisive issue in determining Ms. Castile's eligibility for disabled widow's benefits.  See 42 U.S.C. § 402(e)(1).

activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Ms. Castile was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her in the immediate area, or whether she would be hired if she applied for work.  42 U.S.C. § 423(d)(2)(A).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Ms. Castile was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520 and § 416.920.  The steps are as follows:

(1)    Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

> (2)     If not, did the claimant have an impairment or combination of impairments that were severe?  If not, she was not disabled.
>
> (3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.
>
> (4)     If not, could the claimant do her past relevant work?  If so, she was not disabled.
>
> (5)     If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At step one, the ALJ found that Ms. Castile had not engaged in substantial gainful activity since the alleged onset date of her disability.  R. 14.  At step two, the ALJ concluded that Ms. Castile had five "severe" impairments:  hypertension, sleep apnea, obesity, fibromyalgia and depression.  *Id.*  The ALJ also found that Ms. Castile suffered from the medically determinable impairment of chronic fatigue syndrome, but he did not find this impairment to be "severe."  R. 15.

At step three, the ALJ found that Ms. Castile's impairments, either alone or in combination, did not meet or equal a listing.  R. 16.  The ALJ first noted that there is no listing for fibromyalgia and postponed consideration of that impairment until step five.  He then considered Ms. Castile's obesity under Listings 1.00Q, 3.00I, and 4.00F, as instructed by Social Security Ruling 02-1p, and found "no

indication" that the impairment met a listing, either "alone or in combination with any other impairment." Next, the ALJ found that Ms. Castile's hypertension did not meet Listing 4.03 because there was no evidence of chronic heart failure, and the only evidence of ischemia had been a false positive. The ALJ also found that Ms. Castile's sleep apnea did not meet Listing 3.10 because there was no evidence of cor pulmonale and because her apnea was controlled with use of a CPAP machine. *Id.* Finally, the ALJ found that Ms. Castile's depression did not meet Listing 12.04. Although Ms. Castile's symptoms satisfied the requirements of Part A of that listing, they satisfied neither Part B nor Part C, at least one of which was required to meet the listing. R. 16-18.

At step four, the ALJ concluded that Ms. Castile could perform her past work as an order clerk. In assessing Ms. Castile's residual functional capacity, he concluded that Ms. Castile could lift no more than ten pounds at a time but could occasionally carry files and ledgers, sit for six hours a day, walk and stand for two hours a day, and use her hands and fingers in repetitive actions. R. 18. The ALJ also found that Ms. Castile could have only "superficial interaction" with the public and with co-workers. In reaching this conclusion, the ALJ discussed Ms. Castile's medical record, her hearing testimony, and other evidence of her symptoms as provided in 20 C.F.R. § 404.1529(c). R. 18-22. Considering Ms. Castile's residual functional capacity and giving decisive weight to the testimony of vocational expert Ray Burger, the ALJ concluded that Ms. Castile was capable of performing her past relevant work as an order clerk. R. 23. Because he

determined that Ms. Castile was not disabled at step four, the ALJ did not proceed to step five.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.   42 U.S.C. § 405(g).   Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.   *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, the reviewing court must uphold it.   42 U.S.C. §§ 405(g), 1383(c)(3); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by re-weighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.   *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).   Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.   *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).   A reversal and remand may be required, however, if the

ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level his analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning.  *Diaz*, 55 F.3d at 307-08.

*Discussion*

I.      *Chronic Fatigue Syndrome*

Ms. Castile first argues that the ALJ's erred at step two by determining that her chronic fatigue syndrome was not "severe."  In the specialized language of the Social Security Act, an impairment "is not severe if it does not significantly limit your physical or mental ability to do basic work activities."   20 C.F.R. § 404.1521(a).  The Seventh Circuit has said that the step two requirement of severity is "merely a threshold requirement."  *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999).  It tests whether any of a claimant's impairments have more than a minimal effect on her ability to work.  The claimant must satisfy this preliminary step before the ALJ can go on to consider whether any severe impairment meets a listing at step three and whether the entirety of her impairments prevent her from working at steps four and five.  See *Skinner v. Astrue*, 478 F.3d 836, 844 n.1 (7th Cir. 2007).

The ALJ found that Ms. Castile's chronic fatigue syndrome was "medically determinable" based on physician diagnoses of muscle tenderness and pharyngitis.  R. 15.  But the impairment was not "severe," according to the ALJ, because there were no laboratory findings to complement the medical signs and no evidence of the impairment at all since 2003.  In addition, the ALJ reasoned that the chronic fatigue was not "severe" because Ms. Castile was able to continue working after being diagnosed with chronic fatigue syndrome.  R. 15-16.

-19-

Substantial evidence, including physician treatment recommendations and the absence of recent diagnosis or treatment, supported the ALJ's conclusion. Even if the ALJ had erred at step two, however, the error would be harmless because he went on to consider the entirety of her complaints at step four, as he acknowledged he was required to do. See R. 13-14 ("In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe."); R. 18 (noting consideration of "the entire record" and "all symptoms" in step four determination). See *Gordon v. Astrue*, 2007 WL 4150328, at *7 (S.D. Ind. Nov. 13, 2007) (classification of an impairment as severe or not severe is largely irrelevant after step two so long as the ALJ goes on to consider impact of all impairments, both severe and non-severe, on the claimant's ability to work). In this case, at step four the ALJ's analysis included consideration of Ms. Castile's longstanding complaints of fatigue and the treatment that her doctor recommended. R. 19, 21. This consideration of Ms. Castile's chronic fatigue syndrome at step four rendered harmless any error in determining that the impairment was not severe at step two. See generally *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (doctrine of harmless error applies to review of ALJ's decision to deny benefits).

II.    *Obesity*

Ms. Castile next argues that the ALJ failed to give sufficient weight to the effect of her obesity on her ability to work. Pl. Br. 10-11. The ALJ found that Ms.

Castile was obese and that her obesity was a severe impairment.  R. 14.  In his opinion, however, the impairment did not give rise "to a condition of listing level severity."  R. 16.  Ms. Castile complains that the ALJ failed to consider how her obesity exacerbated her other impairments and how it affected her in combination with those other impairments.  The ALJ's conclusions were supported by substantial evidence and will be upheld.

The Social Security Administration addressed the evaluation of obesity as a disabling impairment in SSR 02-1p, 67 Fed. Reg. 57,859 (2002).  That ruling eliminated a separate listing for obesity but reminded adjudicators that the effects of obesity should be considered in evaluating the severity of other impairments. See also *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005).  In particular, a claimant's obesity might raise "musculoskeletal, respiratory, and cardiovascular impairments" to listing level severity.  SSR 02-1p.

Ms. Castile's claim that the ALJ failed to assess the effect of her obesity on other impairments is incorrect.  The ALJ explicitly noted that he had "considered [Ms. Castile's] obesity using the criteria of the musculoskeletal, respiratory, and cardiovascular impairments," and he saw "no indication that the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of listing level severity."   R. 16; see also *Skinner*, 478 F.3d at 845 (upholding a similar evaluation of combined symptoms).  Ms. Castile faults the ALJ for "ignor[ing] how the obesity may affect the chronic fatigue."  Pl. Br. 11.

This, too, is incorrect.  The ALJ took note of "objective evidence" that Ms. Castile "was prescribed diet and exercise for her fatigue," indicating that he understood and considered the effect of her obesity on her chronic fatigue.  R. 19.  His subsequent finding that those combined impairments did not prevent Ms. Castile from performing past work was uncontroverted by the medical record – no doctor has opined that Ms. Castile is unable to work – and was supported by substantial evidence.

III.     *The Credibility Determination*

Ms. Castile's final argument can best be characterized as an attack on the ALJ's credibility determination.   See Pl. Br. 12-13.   The ALJ found that Ms. Castile's testimony concerning the intensity and persistence of her symptoms was "not entirely credible."  R. 19.  In particular, her complaints were not "credible to the point that they would prevent competitive work."  R. 23.  Ms. Castile argues that the ALJ "ignor[ed] the testimony," that he failed to "build an accurate and logical bridge between the evidence and the result," and that he failed "to evaluate any of the evidence that potentially supports the claimant's claim."  These claims are without merit.

As Ms. Castile acknowledges, the ALJ is responsible for determining credibility.  See, *e.g.*, *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).  The ALJ may discount subjective complaints that are inconsistent with the evidence as a

whole, but the ALJ may not discount such complaints merely because objective medical evidence does not support the complaints. *Id.* at 314; Social Security Ruling 96-7p, printed in 61 Fed. Reg. 34483 (1996).  The ALJ must give specific reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed.  SSR 96-7p; see *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (in making a credibility determination the ALJ must comply with SSR 96-7p, which requires the ALJ to articulate the reasons behind credibility evaluations).

The ALJ did not ignore Ms. Castile's testimony or the evidence supporting her claim for disability.  For example, he credited evidence that Ms. Castile had suffered from fatigue since 1995 and that she suffered from sleep apnea and depression.  R. 19.  The ALJ gave particular consideration to Ms. Castile's testimony and evidence about her fibromyalgia.  R. 20, 21.  The ALJ did, however, discount the severity of some of these impairments.  The record supports his decision.  The ALJ did not rely merely on the absence of medical evidence.  He explained why many of Ms. Castile's complaints were not credible.  He cited medical tests and exams, conducted in response to Ms. Castile's complaints and ill health, that were returned negative for more disabling impairments.  See, *e.g.*, R. 19 (back pain), R. 20 (range of movement and mental clarity, fibromyalgia pain), R. 21 (back pain, shortness of breath).  The ALJ also cited the opinions of treating physicians that Ms. Castile was healthy enough for work or that cast doubt on her credibility.  R. 19.  When Ms. Castile's complaints were supported by the medical

record, the ALJ explained that medication and treatment often resolved or alleviated those impairments.  R. 20, 21.  It is particularly noteworthy that Ms. Castile's physicians never expressed the opinion that she was unable to work because of her claimed impairments.

The  ALJ's credibility finding will not be disturbed unless it is "patently wrong in view of the cold record."  *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986); see also *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ's credibility determination was not patently wrong, and the court upholds it.

*Conclusion*

Accordingly, the court affirms the Commissioner's denial of Ms. Castile's application for disability insurance benefits and disabled widow's benefits.  Final judgment shall be entered accordingly.

So ordered.

Date: November 2, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

John P. Young
john@youngandyoungin.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov